UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TINA PARINI,

        Plaintiff,

  v.                                  Case No. 12-C-1072

CAROLYN COLVIN,

        Defendant.

**DECISION AND ORDER**

Plaintiff Tina Parini brings this action pursuant to 42 U.S.C. § 405(g) seeking review of the decision of the Commissioner of Social Security denying her application for disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

Plaintiff has been diagnosed with depression and anxiety attacks, and she has had physical issues including diabetes and sporadic bouts with anxiety-driven chest pain and frequent headaches. At her hearing before an administrative law judge (ALJ), she testified that she quit her last job in order to care for her boyfriend after he had an accident, but she stated she might have quit soon anyway because she was getting frustrated at the job. (R. 62-63) Her past work included bartending, and working as a food packager and a cashier. She smoked cigarettes and had used cocaine in the recent past. (R. 260.)

Her medical record reveals a number of trips to her physician for things like abdominal pain experienced after "overdoing it" while cleaning her house, helping her boyfriend do work on his truck and lifting logs. (R. 230-31.) She also had complaints of coughing and acid reflux and was urged to quit smoking. (R. 232.) In January 2008 she saw her family practitioner for possible depression after moving out of living with her boyfriend and quitting her job. (R. 245.) Dr. Lamb noted that she was sleeping a lot and "feels worthless." (*Id.*) Dr. Lamb diagnosed major depression and set Plaintiff up with a psychologist.

In April 2008 Plaintiff visited Dr. Li, a psychiatrist, who noted her "gloomy" affect. (R. 261.) Although there was some history of bipolar disorder, he noted that Plaintiff had never been on medication apart from a brief spell with Prozac, which she used to help her try to quit smoking nearly a decade earlier. (R. 245, 261.) Dr. Li prescribed a starter pack of Lamictal, which is used to treat bipolar disorder. A month later she saw Dr. Li again. She was working full time; "friends have noticed changes in patient; pt also noticed significant changes in her mood, able to deal with lows better, highs are not as high . . ." (R. 262.) His assessment read "significant improvement, still some mild depression." (*Id.*) At a June 2008 follow up visit she reported being stressed and had snapped at one of her co-workers recently, but otherwise her mood was stable and not depressed. (R. 266.) Dr. Li again found "significant improvement" and that her "mood has been more stable." (*Id.*)

In October 2008 Dr. Li noted that Plaintiff had multiple stressors: her sister had died, her daughter had left her husband and had moved in with the Plaintiff; and her boyfriend had a severe accident with his truck. (R. 270.) She reported that she had been doing "okay, considering the circumstances," and again Dr. Li noted that her mood was relatively stable. (*Id.*) By January 2009

2

she reported feeling "crappy" and having episodes where she "flips out." (R. 274.) Dr. Li noted "worsening depression and mood swings." (*Id.*) Plaintiff applied for disability benefits the same month. (R. 144.)

The record also includes two mental health assessment forms completed by Dr. A. Suansilppongse, a physician who served as a psychiatric consultant, on June 8, 2009. (R. 350, 364, 368.) Dr Suansilppongse concluded that Plaintiff had a severe mental impairment, namely bipolar disorder, but it was not so severe as to meet or equal the Agency's Listing for that impairment such that she would be presumed disabled. As to her mental residual functional capacity, Dr. Suansilppongse concluded that Plaintiff had the mental capacity to perform simple work related activity. (R. 368.)

## II. The ALJ's Decision

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine tasks. The ALJ also concluded that Plaintiff is restricted to limited interaction with public and co-workers. (R. 20.) In reaching this conclusion, the ALJ found that Plaintiff did not suffer from any severe physical impairments. She had gone to the ER for chest pain but tests cleared her of cardiac issues. (The emergency room physician diagnosed her with chest wall pain and gastroesophageal reflux disease.) (R. 281.) She took ibuprofen for headaches and other intermittent muscle issues, but there was nothing disabling about those conditions. And although she was recently diagnosed with diabetes and was given medication for that condition, there were no signs of organ damage or that the condition was disabling.

3

The ALJ also found that Plaintiff's mental health issues did not preclude work. Although Plaintiff had alleged serious bouts with depression and anxiety, the ALJ discounted her credibility to the extent she testified those conditions were disabling. First, the ALJ noted that Plaintiff's compliance with treatment regimens was lacking. Plaintiff had skipped at least one therapy session and did not always take her medication, which records showed to improve her condition. Second, the Plaintiff's stories relating to her application for benefits undercut her disability claim. For example, she stated that she ended her job with a temporary agency because the contract was up and there were no more placements for her—not because she was unable to work. In addition, she told a counselor that she was applying for benefits because she wanted to go to school. Third, there was evidence that the Plaintiff was frequently involved in strenuous physical activities or social interactions like dating and attending concerts with friends. Finally, the ALJ noted that Plaintiff had expressed very recent indications of a desire to work. She stated that she considered going to driving school so she could get a commercial license, which would allow her to accompany her boyfriend on the road. And in February 2009, she was getting unemployment benefits while looking for a job. In the ALJ's view, all of these things painted a picture of someone who had some mental health issues but who was nevertheless able to function well enough to work.

Finally, the ALJ noted that the most restrictive functional capacity assessment in the record came from the psychiatrist, Dr. Li. He found a GAF score of 60 (indicating some moderate limitations on functioning) and no specific functional limitations. On the disability form he filled out, Dr. Li did not respond to questions as asking about how often the Plaintiff would need to miss work or if she was a malingerer. (R. 494.) Based on all of the above, the ALJ found that Plaintiff had overstated her limitations and found her able to perform her past work.

4

### III. Analysis

Under 42 U.S.C. § 405(g), "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." § 405(g). On review, the court will overturn the Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 699 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir. 2000).

**A. Question to the Vocational Expert**

Plaintiff's primary argument is that the ALJ's decision must be reversed because the ALJ's hypothetical question to the vocational expert failed to account for Plaintiff's limitations in maintaining concentration, persistence or pace. The argument is based upon a form completed by the Dr. Suansilppongse, the psychiatric consultant. To understand Plaintiff's argument, it will first be necessary to describe how the Social Security Administration (SSA) evaluates mental impairments.

The SSA uses a "special technique" to determine whether a claimant has a mental impairment, whether it is severe, and whether it meets the criteria for one of the Listings for mental impairments in Part A of the Listing of Impairments. 20 C.F.R. § 404.1520a. The special technique used to evaluate mental impairments requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If a mental impairment is found, SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily

living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five point scale: none, mild, moderate, and extreme. The degree of limitation for episodes of decomposition is rated on a four-point scale: none, one or two, three, four or more. These ratings are then used to determine whether the mental impairment is severe and, if so, whether it meets the criteria of one of the Listings for mental impairments. If a claimant has had no episodes of decomposition and the first three functional areas are rated none or mild, the agency generally concludes that the claimant does not have a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1). If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at step three of the SSA's sequential evaluation process. 20 C.F.R. § 404.1520(d)(2). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then the SSA assesses the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The Psychiatric Review Technique (PRT) form is used to document the various steps required by the special technique to evaluate a mental impairment. A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's impairment, though severe, does not meet or exceed the criteria of a Listing and a mental RFC must be determined. The use of these forms is explained in the SSA's Program Operations Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* DI 24505.025 and DI 24510.060.

In this case, Dr. Suansilppongse completed both the PRT and the MRFCA forms. On the PRT, Dr. Suansilppongse checked the boxes to indicate Plaintiff had moderate limitations in

6

maintaining social functioning and in maintaining concentration, persistence or pace. (R. 360.) Plaintiff contends that the ALJ erred because, even though he adopted Dr. Suansilppongse's findings, the hypothetical question he formulated for the VE left the latter limitation out. Specifically, the ALJ asked the vocational expert to assume the person "is limited to simple, routine tasks. And limited contact, public and co-workers." (R. 74.) The vocational expert testified that with those and other restrictions the Plaintiff could perform jobs in the food service industry, in the garment business or as a mail clerk. (R. 75.) Although "simple, routine tasks" is a kind of shorthand ALJs sometimes use, courts have held that it does not specifically account for limitations in pace, concentration and persistence. *See, e.g., Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), and cases cited therein. Plaintiff argues that the ALJ's failure to properly include those limitations here requires that the case be remanded.

It should be noted at the outset that Plaintiff has misstated Dr. Suansilppongse's finding on the PRT and the ALJ's adoption of it. Dr. Suansilppongse found that Plaintiff had moderate limitations in "maintaining concentration, persistence *or* pace," not in maintaining concentration persistence *and* pace, as Plaintiff contends. (R. 360) It is that finding that the ALJ adopted at steps two and three of his analysis. (R. 20.) More fundamentally, Plaintiff's argument ignores the ALJ's statement in his decision that the findings of moderate limitations in the broad categories of maintaining social functioning and maintaining concentration, persistence or pace were not findings as to Plaintiff's RFC, but are used merely to assess the severity of the impairment as required under the special technique. The ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity

7

> assessment used at steps 4 and 5 of the sequential process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(R. 20.) This statement is consistent with the POMS instructions for the PRT and the Agency's special technique described in the regulations. *See* 20 C.F.R. § 404.1520a.

Plaintiff's argument also ignores the more detailed MRFCA that was also completed by Dr. Suansilppongse. It is in the MRFCA that the medical consultant is to record the claimant's mental RFC. The first section of the MRFCA is entitled "Summary Conclusions." There the form lists twenty mental health functions grouped under four main categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. To the right of each of the mental health functions is a series of decision checkblocks under the headings: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. At the end of the form is a space under the heading "Functional Capacity Assessment" where the actual mental RFC is to be recorded in narrative form. (R. 364-68.) *See* POMS, DI 24510.060.

Unlike the PRT, the MRFCA does not have a box for mild limitations. In completing the worksheet section of the form, the medical consultant is instructed to check box one indicating that the claimant is "'Not Significantly Limited,' when the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity." POMS, DI 24510.063. Box two, indicating the claimant is "Moderately Limited," is to be checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Id.* In other words,

8

Case 1:12-cv-01072-WCG   Filed 09/24/13   Page 8 of 14   Document 20

a "moderate" limitation on the MRFCA means only that there is some limitation. The instructions note that "[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III." POMS, DI 24510.063. Finally, even with these qualifications, the worksheet itself is not considered part of the RFC. According to the POMS, "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060 (bold original); *see also Smith v. Commissioner of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff.").

Here, Dr. Suansilppongse checked boxes in the "Summary Conclusions" section of the MRFCA he completed indicating Plaintiff had moderate limitations in the following activities: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods of time; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (R. 364-65.) As noted above, however, these checks on the worksheet section of the form meant merely that Plaintiff had some limitation in these areas. In the narrative

9

section of the report where the consultant is required to elaborate on the claimant's capacities and describe the claimant's mental RFC in narrative form, Dr. Suansilppongse wrote:

> This 42-year-old claimant has history of bipolar disorder, and transient episodes of mixed emotions (anxiety and depressive reaction, irritability) primarily related to physical ailments, pain, family problems and polysubstance abuse (alcohol and cocaine). Her mental condition is self-limiting or improved with treatment and sobriety. There is no evidence of significant thought disorder or cognitive deficits. Her ADLs are largely limited due to her alleged physical restrictions.
>
> The claimant is able to understand and remember simple instructions. She is able to carry out simple instructions. Her ability for sustained concentration and persistence or for task completion would be minimally limited due to anxiety and depressive reaction as well as alleged pain. Her ability for appropriate interaction with supervisors, coworkers or the public would be minimally limited due to depressive reaction and infrequent episodes of irritability. Her adaptability in a routine work setting would be minimally limited due to depressive reaction and polysubstance abuse.
>
> The psychiatric impairment severity does not meet or equal any Listing. The claimant has mental capacity for simple work related activity with minimal limitation due to alleged pain. Diagnoses: 1. Bipolar Disorder, 2. Polysubstance Abuse. Claimant's allegations are considered partially credible.

(R. 368.) It is this RFC that the ALJ incorporated into the hypothetical question he put to the vocational expert. He did not err in doing so.

This case much more like *Johansen v. Barnhart* than *Stewart v. Astrue.* In *Johansen*, a state agency physician concluded that the claimant fell somewhere between "Not Significantly Limited" and "Moderately Limited" in three areas. *Johansen v. Barnhart,* 314 F.3d 283, 285-86 (7th Cir. 2002). The doctor then "translated his worksheet observations into an assessment of Johansen's mental residual functional capacity (RFC) and concluded that he could perform repetitive, low-stress work." *Id.* at 286. The ALJ then incorporated this RFC into a hypothetical question to the vocational expert, asking whether there would be available jobs for someone of the claimant's

10

age and experience who could perform low-stress, repetitive, unskilled work. The Seventh Circuit found this perfectly acceptable: "because Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to the [vocational expert]." *Id.* at 289.

That is precisely what the ALJ did here. Following the Agency's detailed instructions for completing the PRT and the MRFCA, Dr. Suansilppongse found that Plaintiff retained the capacity to perform simple work related activity. Thus, unlike *Stewart* and the other cases on which Plaintiff's argument rests, it was the medical consultant, not the ALJ, that translated Plaintiff's limitations into an RFC for simple, routine work. Based on Dr. Suansilppongse's findings, the ALJ's hypothetical was proper. Plaintiff is not entitled to a remand on this ground.

**B. Credibility**

Plaintiff also argues the ALJ erred in his credibility determination. Most of the Plaintiff's objection is to the ALJ's use of the now-familiar boilerplate that seems to appear in every ALJ opinion. It is true that the boilerplate language adds little to the discussion and confuses matters, but boilerplate is not *per se* grounds for reversal. "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). Instead, the question is whether the ALJ's determination of credibility was supported by the evidence. In assessing credibility, the ALJ must consider the factors set forth in the regulations and must support the credibility findings with the objective and other evidence in the record. 20 C.F.R. § 404.1529(c); SSR 96–7p; *Villano v. Astrue,* 556 F.3d 558,

562 (7th Cir. 2009). The ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). In addition, "the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011). A court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Id.*

Here, the first thing the ALJ noted in his credibility determination was that the medical evidence simply did not support a finding of disability. (R. 21.) That is undeniably true. Nothing in the medical evidence suggests that the Plaintiff's mental illness would preclude the ability to work. She had been doing better on medication, and Dr. Li's treatment notes were generally upbeat apart from those arising out of a single January 2009 office visit. Dr. Suansilppongse found that Plaintiff could do simple work and would only be minimally limited by her mental health issues. Even Plaintiff's own testimony did not support the idea that she was unable to work. She testified that she suffers from depression and bipolar disorder, has anxiety and some anger issues. (R. 64.) But nothing in her testimony suggested these conditions were disabling. The National Institutes of Mental Health estimates that more than 25 percent of adults suffer from some diagnosable mental disorder, and yet relatively few of these individuals have a severe enough condition that they are deemed unable to work.[1] The Plaintiff's testimony merely supports the finding that she is one of millions of people who suffer mental illness—not that she cannot hold a job.

---

[1] http://www.nimh.nih.gov/health/publications/the-numbers-count-mental-disorders-in-america/index.shtml (last visited September 6, 2013).

12

The ALJ also focused on the reasons the Plaintiff gave for giving up work. She testified that she left one job in order to care for her boyfriend, and another job ended simply because her contract was up. There was nothing in the record suggesting that she quit or was fired because of issues relating to her health. The fact that she did work does not *prove* she had the residual functional capacity to work, of course, because sometimes people undergo great hardship in order to put food on the table. Yet there is nothing in the record to suggest she was one of those individuals. Her treatment notes were usually fairly benign and consisted of instances of mild depression and sporadic bouts with various physical problems. The ALJ was therefore entitled to cite her recent work activities in discounting her credibility, particularly the fact that she never cited her health as a reason for ending a job.

It is true that some of the factors the ALJ cited do not necessarily prove Plaintiff was exaggerating. That she had met boyfriends online or went to a rock concert on a single occasion does not mean she can work. But the ALJ's other, more substantial, reasons suffice to build a logical bridge between the evidence and the conclusion he reached. His credibility conclusions are therefore more than adequately supported.

**C. Ability to Sustain Work**

Finally, Plaintiff argues that the ALJ erred in not finding that she would be unable to sustain work due to her mental illness. Plaintiff asserts that the vocational expert noted that an individual who had cycles of good periods and bad periods might have difficulty maintaining work. (R. 78.) Above I have noted that the record is not supportive of a finding that the Plaintiff's mental illness would have a material impact on her ability to work. Accordingly, the ALJ did not err in failing to make such a finding.

13

## IV. Conclusion

For the reasons given above, the decision of the Commissioner is affirmed.

**SO ORDERED** this   23rd   day of September, 2013.

           s/ William C. Griesbach
           William C. Griesbach, Chief Judge
           United States District Court